Mr. Harrington? May it please the Court, This case concerns whether General Dynamics should recover approximately $30 million because the Navy, consistent with the Party's accepted practice over the entire five-year contract term, transmitted delivery orders by e-mail instead of by U.S. mail. This Court should reverse the decision below. General Dynamics waived strict compliance with the contract ordering clause by acknowledging, accepting, and performing 16 consecutive e-mail delivery orders and by then treating the delivery orders at issue in precisely the same manner. In addition, General Dynamics should be utterly stopped from objecting to e-mail delivery orders only after the contract expired, at which point the Navy could no longer cure the objection by placing orders in the mail. Turning first to the question of waiver, what needs to be defined is the intentional relinquishment of a known right or alternatively Counsel, before you turn to waiver, on equitable estoppel, it seems to me that both parties agree that the lower court applied the wrong test. Is that right? I mean, I say both parties agree because you both cite the right test in your respective briefs, but it is not exactly the same test that the district or the lower court applied. That is correct, Your Honor. This Court laid out the three-part test that applies herein. It's unbalanced decision in Aukerman. Okay, so if the lower court applied the wrong test, should we vacate and remand for them to apply the correct test? Or why do you think is there just no dispute over fact here and we should go ahead and apply the correct test ourselves? At a minimum, the Court should vacate and remand. We believe that once you look at the correct standard, there really is no factual dispute about whether there is misleading conduct, whether there was reliance, whether there was material prejudice. But if the Court believes that there is a dispute as to any of those factors, then the appropriate thing to do would be to remand and have the Board in the first instance apply that test because that was not the test that the Board applied. Now, this was an indefinite supply contract, right? Yes, Your Honor. Why weren't these e-mail orders that come right at the end just offers which you were free to accept or refuse? Well, Your Honor, the discussion in General Dynamics brief characterizes them as counter-offers, and I believe that's what you're getting at. Yes. And the reason that they're not counter-offers is because they precisely match the substance of the orders that were permitted under the I.Q. contract. They were for products that were available under the contract. They didn't alter contract pricing. They made no change to delivery terms or delivery schedules, and they didn't exceed permissible quantities. So all of the substantive aspects of these delivery orders were complied with. I'd note that General Dynamics has not spelled out the nature of the purported counter-offer that we are talking about, but it apparently construes the delivery orders as making some sort of implicit offer to modify the I.D.I.Q. contract's ordering laws, and that's in the underlying contract. If the Navy had proposed such a change, it wouldn't be proposing a counter-offer at all. It would be proposing a modification to that extant contract. And moreover, if the Navy had proposed some sort of modification to that contract, the modification was accepted when General Dynamics performed the first one of a series of 20-some delivery orders. If what the Navy was saying, accepting the argument for the sake of argument, accepting their position for the sake of argument... Well, you've been telling us, and I think what I hear you saying, is that there has been a course of dealing whereby the parties have accepted e-mail orders. However, we're also told that there was a course of dealing where there would have been discussion, particularly for these products, where each order resulted in a loss for the contractor. And so how are we to decide which aspect of this course of dealing outside of the contract, contrary to the expressed terms of the contract, are nonetheless to be imposed? I'm not sure I followed your alternative course of dealing that you're referencing, Your Honor. There is some discussion in the briefs about that there were negotiations before certain delivery orders were transmitted. Is that what you're referring to? Yes. Well, let's talk about that specifically. There were a total of 29 delivery orders under the contract, and 28 of them were sent by e-mail, beginning back in 1999 all the way through 2003. All in violation of the letter of the contract with no change in the contract terms. That's correct. They were not consistent with the letter of the contract, but there's no question that, with respect to the first 16 of these e-mail delivery orders, that there was a waiver of that contract provision. And how do we know that? Because of each of these first 16, they were accepted, they were ratified, they were performed by General Dynamics without objection. So we have a solid course of conduct here for the first 16, and then with respect to these 11 that are now at issue, exactly the same sort of process went on with respect to those. They were sent, and they were ratified by confirming e-mail by General Dynamics. Now, going back to your point, there is some discussion about negotiations that preceded certain delivery orders. Well, there have been two delivery orders that have been identified where there were negotiations that preceded the delivery orders. Delivery Order 5, which came after the so-called down-select, which was when the Navy picked General Dynamics over Raytheon, and then Delivery Order 8, where the Navy agreed to a 30-day extension for option year 1 pricing. Each successive option year, as you know, had lower pricing. And with respect to Delivery Order 8, the Navy negotiated with General Dynamics and extended option year pricing for one month. That's two delivery orders out of a total of 27 delivery orders. Excuse me, out of a total of 26. Let me try that again. That's two delivery orders. There were 26 other e-mail delivery orders. So cherry-picking two orders does not establish a course of conduct when you've simply taken two out of a total number of 28 different e-mail deliveries. You're including the last batch, which was rejected in 2008. I am. And if you want to narrow it to exclude those delivery orders, then you're still picking two delivery orders out of 16 that were unequivocally accepted and performed without regard to the ordering clause. And I'd also mention, Your Honor, in that regard, of those two, Delivery Order 9 preceded a modification, but that modification actually lowered prices. That was one that didn't increase prices. The first one lowered prices. Only the second one, only Delivery Order 8, was issued at higher prices as a result of the preceding modification. So really, once you take that factor into account, you're looking at one single delivery order that preceded negotiations that culminated in a modification that changed pricing. Can I ask you a factual question? This is about the confirmation letters that you referred to. The one I found in the appendix is JA-211. Do you have your appendix handy? I do, Your Honor. There may be others. I don't know which one this is for. If it's for the last one. It's a 2003 one, so I'm thinking it's one of the latest ones. It is one of the last ones. Okay. But this isn't what I expected. You guys keep talking about a confirmation letter. I couldn't. I mean, it took me a long time to realize this was, in fact, a confirmation letter because it doesn't actually say it's confirming anything. It was all it is, and it's not even to the Navy. It's an internal. It looks like, to me, an internal General Dynamics letter just sort of mentioning that a delivery order was received. But it's not. So certainly it at a minimum acknowledges they got it, but I don't think they're making an argument they didn't. So I guess how is it that I ought to construe this as the confirmation letter such that your waiver argument really has the bite that you'd like it to have? Well, Your Honor, part of the significance of this memo is that this was something that was done with respect to all of these e-mail delivery orders. So it was part of the overall practice. So it was done with respect to the first 16. What happened with the first 16 is an order was placed, a confirming memo was sent, and each of these was sent to the administrative contracting officer. There's no dispute that that is, in fact, what was done with each of these. It was also used for internal purposes at General Dynamics. So the significance of this— Wait, you say it was sent to the administrative—isn't Stephen Polowski, or I'm not saying— he is the administrative contracting officer, right? Your Honor, he was at General Dynamics. Mr. Polowski was the person who was offering this— Oh, you're talking about Jim Anderson, the Navy guy, right? Yes. At the bottom, the CC, the last of the CCs. So it wasn't sent to him. He was CC'd on it. This isn't a confirmation letter like, we received your order, thank you very much, we're processing it now. You should expect to receive it in six to eight weeks. I mean, it's not like what I think of as a confirmation letter. This is an internal memo from someone in General Dynamics to someone in the accounting department at General Dynamics. It's just that the long list at the bottom of CCs, there happens to be the one Navy guy on there. Yes, it is CC'd to the one Navy person. But the significance of these is that there was a affirmative step taken by General Dynamics to notify the Navy that they had received the order, that they had identified what was being ordered, and consistent with the practice throughout this term, they were saying, what they did every time was they received it, they confirmed it, and then through the contract period at least, they filled it. Now, as of September 30th, after September 30th, they came back and they said something different. They came back and said, we're not going to fill these. But up until this time, this confirming memorandum signaled to the Navy that we've received it and we're going forward with the order. I'd like to note also, Your Honor, going back to waiver itself, we're talking about waiver itself, that the authority is that the objective apparent intent of the contracting party is controlling and assessing waiver. And the Board did not acknowledge or apply that principle. The Board focused instead on General Dynamics' presumed subjective intent, and we know that because one of the things that the Board says in talking about waiver is it found that General Dynamics had no intent to waive because certain employees, quote, did not realize, unquote, that delivery orders were not to be issued by email. That's talking about the subjective understanding of particular General Dynamics employees, not the objective apparent intent from the overall course of conduct. And at the same time, the Board said that General Dynamics did not object to earlier orders because they wanted to continue working with the Navy and had no direct desire to reject those orders. But that was never in any way communicated to the Navy. It's the Navy's obligation to comply with their statute, isn't it? To comply with statute, Your Honor? Well, to comply with the contract terms. It is, Your Honor. But what we're talking about here is a course of conduct where General Dynamics misled the Navy into continuing to use email because they never mentioned it or objected to it. Now, why was that misleading? The Navy violates the contract terms. General Dynamics accepts the order, fulfills the order. That's right. And so you're saying that all of this is now the fault of General Dynamics who is prohibited from ever requiring or suggesting to the Navy that they comply with the contract. Your Honor, what is misleading about it is that General Dynamics accepted email orders without objection. They didn't suggest that they had any problem with this. They didn't request it by email. In fact, General Dynamics had no problem with email delivery orders. They don't contend that the orders were inefficient, confusing, that they weren't being received, or even that they preferred some other means of communication. Their own communications were generally by email, and if they wanted hard copies of the delivery orders, and they asked or objected, the Navy would have promptly complied with that. It was because General Dynamics never mentioned it, despite frequent communications and despite a course of conduct that was unwavering, that the Navy believed that email delivery orders were acceptable. They did this over a five-year period. Do you wish to say anything? I do. Thank you. Ms. Goldenberg? May it please the Court, Elaine Goldenberg for General Dynamics C4 Systems. The key factual conclusion by the Board here, that the government is not really grappling with, is found on page 24 of its decision, and it says that the context in which these orders were rejected was materially different than the context in which earlier email orders were performed. And therefore, there's nothing misleading here. And the key facts that the Board relies on in support of that conclusion are three facts that are very well supported by factual determinations that are entitled to great deference here.  in breaking off negotiations between the parties and rejecting a suggestion of waiver on the part of the government, that the letter of the contract should be enforced, and therefore replaced what the Board described as the constant negotiations between the parties with a new approach. This is in July of 2003, and it's essentially a sea change in the parties' relationship. Second, that the orders represented a huge loss to General Dynamics, and that General Dynamics was very unhappy with the situation. And third, that the contract and binding federal regulations forbade the use of email here. In light of all of these facts, the Board's conclusion must be right, that the Navy must have known, and a reasonable person would have known, that in September 2003, General Dynamics is going to stand on its rights if it can, enforce the letter of the contract, just as the Navy has suggested, and get out of these money-losing orders if it's possible to do so. And in fact, after that July 2003 letter, General Dynamics rejects every email order that it receives from then on. Now, the Navy here has talked about how there were only negotiations before certain delivery orders, and again, I think that really flies in the face of what the Board actually found here. The Board found that there was a constant state of negotiation, that's at paragraphs 40 and 49 of its decision, that it was a major change in Navy behavior. But we have to look to see whether those fact bindings are supported by the record. So why don't you explain to me, if you don't mind, going through the facts a little bit, and just explaining prior to which delivery orders exactly was there a renegotiation, and what was the subject of that renegotiation? Sure. Well, I think my colleague is correct, that there were negotiations before delivery orders 5 and 8, which were so-called major orders for radios. And in that case, there was, for instance, with respect to delivery order 8, an extension of the option 1 prices, so the highest prices under the contract. But hold on. So that's actually in favor of general dynamics, right? Yes. But the idea maybe you would say is, well, they extended so we accepted by e-mail. That was the compromise. Is that what you're saying? I'm not sure that we're suggesting that there's any kind of quid pro quo or give and take here. What we're saying is that it's from the perspective of September 2003, where the relations between the parties have essentially broken down, and the Navy has said, you know what, there's no waiver here. This is when the Navy ordered the HF waveform, which it had essentially promised not to do. There's no waiver here. It's the letter of the contract. That's how we're going to run things from now on. But these negotiations, go back to that. I don't want to take you off course. So before delivery order 8, there was the extension of option 1 pricing, which favored general dynamics, and that's the only negotiation point there was. No, no, no, Your Honor. That's not so. Oh, then tell me. Absolutely. Before delivery order 13, for instance, that's another specific example that we talked about in our briefs where prices were raised for repair parts, and then the Navy immediately ordered repair parts. And then the key point is that there was a long course of negotiations that actually... Wait, wait. So price raised for repair parts, that also favors general dynamics, right? Correct. That's correct. Then there's a long period of negotiations that goes on for about a year. But you also said number 5. What was the... Right. Number 5, it's complicated, but essentially there was a so-called down-select process where the Navy was choosing between two companies, and so there was a price bid, and the Navy chose general dynamics at that stage. And so it favors general dynamics in the sense that they got selected to go on with the contract. Then there's this long period of negotiations that goes on, as I say, for about a year, up to the July 2003 letter that cuts it off. Parties are negotiating about a variety of things, but primarily the most salient part is the HF waveform, which is going to cost general dynamics tens and tens of millions of dollars to produce, and it's going to create a huge loss for the company. And general dynamics believed that the Navy had agreed not to order the HF waveform. When the Navy did then order the HF waveform, general dynamics was shot. That's the point at which negotiations broke down. But there were a number of delivery orders that were issued during the period of negotiations, such that, you know, at that point, general dynamics still thought, okay, we're working together here, the Navy's trying to ameliorate our losses, and when those negotiations break down is the point where the party's relationship changes, and it's no longer reasonable to believe that general dynamics isn't going to exercise its rights. Okay, so by number, which ones were issued during that one year of negotiation, which would be from 2002 to 2003 that you're referring to? Yes, so that would be 13, 14, 15, and then it's 16, that's the actual HF waveform order. That's the new orders. Well, 16 is the HF waveform order that gives rise to the July 2003 letter. The $30 million order. Exactly. But there's no negotiations occurring before 4, 6, 7, 9 through 12, 14, and the 11 at the end, right? Well, with respect to the 11 at the end, that's certainly true, and with respect to, I guess that's what I remember, but nevertheless, for one thing I'd say that it's not clear how delivery orders 2, 3, and 4 were issued. They may have been issued by mail. The record actually isn't clear on that point. It's not clear at all if they were issued by email. The contracting officer at the time didn't recall how they were issued, and there's actually no evidence that they were issued by email, but the main point is that there was, as I say, and the board finds this, there was a constant dialogue. There was a constant back and forth. There was this whole series of discussions, and that is broken off at the point where the Navy says, we are going to enforce the letter of the contract, and the point is that from the perspective of a reasonable person, in September 2003, no reasonable person could have expected that given the change, that General Dynamics is not going to try to escape from these orders and enforce the letter of the contract just as the Navy had suggested, and as I say, that's... Okay. I don't think that they're arguing that you weren't trying to escape from the contract. I think everybody in this room knows General Dynamics was escaping from the contract, but the question I think really that we have to figure out is whether or not, among other things, equitable estoppel ought to apply here because General Dynamics accepted e-mail orders throughout the entire process, so why would the Navy think suddenly that's going to have changed? Because the context is so different. That's what the Board has found as a matter of fact because from the perspective of somebody after the parties and relations have broken down, they're not going to rely on that prior course of dealing. But you... General Dynamics' own position in this case is that they weren't even aware of the fact that the government was supposed to mail delivery orders until October after the option period had expired, okay? Right. So a big part of General Dynamics' position is we never even knew that the contract required e-mail, so we accepted them all along. So why would the Navy expect you to change your posture as to e-mail when everyone believed all along, both parties believed consistently from the very beginning until the end of the contract that e-mail was an acceptable form of sending the delivery orders? Why would they think just because you're in negotiation, suddenly your mindset's going to change on that point? Well, Your Honor, I think because it's an objective test, as the Navy has emphasized very strongly here, and so the question is what a reasonable, objective observer would think in that setting. So it doesn't matter what General Dynamics did or didn't actually know at that point in time except to the extent that that goes, I think, to the equitable discretion that the Board is exercising because if there had been some nefarious plan, I think that would make this a very different case in terms of the equities. I'm perhaps saying the same thing as Judge Moore, but none of these negotiations have anything to do with e-mail as a form, does it? No, that's right, Your Honor, but our point is that it's the relationship between the parties in general that's the key, and when it breaks down, to some extent, it doesn't even matter what happened before and how many negotiations there were or weren't. When the Navy issues this letter and says, you know what, we're not going to talk to you anymore, we're going to enforce the letter of the contract, and that's how it's going to be. But all of that seems somewhat irrelevant to whether or not the e-mail form was something that you had waived as an objection long before. Since you've never objected, it had never been an issue, and it had been the standard way of dealing with each other, that tends to support Judge Moore's point, doesn't it? That that isn't what you're even talking about. No, I think that's right, and it's clear that the parties never discussed whether e-mail was acceptable or not, but I think what the law is saying here is when you're trying to imply waiver or estoppel from conduct, it's a hard test, and if there's some ambiguity in the conduct, you don't just get to assume, well, hey, this person must not care about this anymore. The law is pushing you in that context to actually raise it and have a discussion about it. And so, for instance, with respect to waiver, it has to be the only reasonable conclusion that you can draw from the party's conduct that they've actually waived. And with respect to estoppel, there has to be misleading conduct and also reliance, which the Board again found as fact, a quintessential factual determination, that there was no reliance by the Navy here, that the Navy issued these things by e-mail for reasons of its own and actually continued to issue these orders by e-mail even after General Dynamics complained here under contracts that had exactly the same prohibitions. So the fact that General Dynamics had brought this issue to their attention didn't stop them from continuing to e-mail orders under contracts that didn't permit it. And again, the Board has made factual findings on this that the Navy doesn't establish are not supported by substantial evidence, which is a very difficult test under the statute. I think the government has a couple other answers to the Board's core factual finding, which is drawn from inferences from the party's behavior that are a matter of fact. One is the confirmation point, and as Your Honor suggested, I think it's very clear, both from the Board's findings and from the confirmation itself, that there's nothing about this that suggests anything but that perhaps General Dynamics received these e-mail orders, which is not something that we're contesting. There's nothing about them that indicates acceptance, confirmation of any kind, and the contracting officer never suggested that these meant anything to him until this appeal. And so there's no way that the Navy can rely on those to take this case out of the realm of implied waiver. I think the Navy also suggests that the Board applied the wrong legal standards here, and that's simply not so. With respect to waiver, it's very clear that the Board talked about what intent was manifest by the party's conduct, and we collect those citations to the Board's discussion on page 38 of our brief. With respect to estoppel, I'm sorry. Go ahead. I was going to say, for estoppel, it seems to me they applied an outdated and older case which articulated a different standard. It begins on page 24 and goes up to page 25. They're citing a 1976 court-of-claims case, and we've got an in-bank case of this court that comes much later that articulates the test in very different terms. I wouldn't say the terms are very different at all. The later case is a patent case. The earlier case is a government contract case. Well, the first one says appellant knew the facts. There's nothing in our current equitable estoppel case law, as I can see, that requires the appellant to know the facts, for example. Well, I think whether appellant knew the facts and the other side didn't know the facts is all just another way of saying, is the conduct misleading? And the Navy admits in its opening brief in this court that these tests are essentially equivalent for that reason, and before the Board, in their post-hearing brief before the Board, the Navy said the same thing, that the Rell-Reeves test breaks it into four factors, that the Ockham decision breaks it into three, but they're both getting at exactly the same issues, which are, was there misleading conduct, was there reasonable reliance, and was there some kind of harm? And so I don't think you can say that the Board applied the wrong test here. I think that's a... Well, then why did we take it in bank? Well, we took it in bank and articulated a three-factor test, and the previous one had been four? The previous one said knew the facts. There's nothing... Misleading conduct doesn't require knowledge. It just requires that it's ultimately misleading. Well, what the court also said in the Ockham case is that estoppel is a highly fact-intensive inquiry. It's very hard to break down into its constituent parts, that these factors are guides for when there should be estoppel, but not necessarily the be-all, end-all of estoppel. And as I said, I think that test was articulated in a specific patent context, which is a little different than the government contracts context here. But the point is that the Board's factual findings addressed whether there was misleading conduct, and it found that there was no misleading conduct here because the contexts were so very different, the context in which the orders were rejected and the initial context in which the orders were performed. And that goes to and is dispositive of the misleading conduct factor of the equitable estoppel test. I think that one other gambit that the Navy makes is to essentially misread or misunderstand our counteroffer argument, which I'd like just to touch on very briefly. Our position is not that the Navy, through issuing these orders by email, counteroffered that email was okay. It's that because their purported acceptance didn't match the terms of the offer exactly, it was converted into a counteroffer for the substance of the transaction. Will you sell us these radios at these prices? General Dynamics is then free to say yes or no in each one of those instances. And there's no law that just because you've accepted an offer one time, you have to accept it another time. That's the argument that we're making with respect to counteroffers. But as I said, I think the absolute core of this case and the key to the Board's decision, which is a factual matter that this Court must defer to under 41 U.S.C. 609B, is this determination that from the perspective of a reasonable person in September 2003, a reasonable person could not have understood that General Dynamics' prior conduct, which took place in a context in which the parties were trying to ameliorate the situation, this incredible loss of money for General Dynamics,  not even counting research and development, that that prior course of conduct would have had any bearing on the situation that the parties were faced with in September 2003, this total breakdown, the sea change in their relationship. If there are no further questions. Thank you, Ms. Goldenberg. Mr. Harrington, you have a little over a minute remaining. Your Honor, with respect to estoppel, we believe there's no doubt that the Board did not apply the modern three-part standard. And as this Court held in Walther v. HSS, insofar as a finding is derived from the application of an improper legal standard, it cannot be allowed to stand.    insofar as a finding is derived from the application this case needs to be remanded to the Board. I heard discussion about negotiations. I think there were mentioned three different delivery orders that were preceded by negotiations. That means that there were at least 13 that were not. And more importantly, with respect to those negotiations, never at any point in those negotiations was any mention made of the delivery of orders by e-mail. That wasn't a part of the negotiations. That issue didn't come up. There was no quid pro quo. We'll accept these orders even though they're done by e-mail because you've done something we like. There was a mention of reliance. And there is evidence in front of the Board of reliance. To the extent that the case is remanded to the Board, that should be an issue. But what we know from the evidence that came out already is the contracting officer testified he had no reason to believe that General Dynamics did not want delivery orders to be transmitted by e-mail until October 2003 after the contract had expired and that he stopped transmitting delivery orders by e-mail after he had received General Dynamics' objection. Thank you, Mr. Harrington.